Good morning, Your Honors, and may it please the Court. My name is Ellen Hecker, and with me today is my co-counsel, Leticia Marquez. Together, we represent Petitioner Appellant in this case, Angel Medrano. Okay. I remind you, the acoustics here, and it's not your fault, the acoustics are bad, so if you could articulate clearly, it would be useful. Absolutely. I'd like to reserve three minutes of my time for rebuttal. I'll plan to watch the clock. Could you speak more slowly? Yes. This case is before the Court today because the prosecutor suppressed key evidence related to the existence and account of an eyewitness. The eyewitness' testimony gives rise to the two issues that are before the Court today, both Mr. Medrano's Brady claim, which I intend to focus on, and his ineffective assistance of counsel claim. Counsel, the blue brief argues that the prosecution affirmatively misled the defense about the existence of this child, or the fact that the child saw anything. What's the record support for that? In the record, the facts demonstrate that defense counsel interviewed the investigating officers, and the investigating officers, this is at ER 376 through 379, the investigating officers affirmatively told the defense counsel that Lonnie Lesbrun did not witness the crime. So I looked at those pages, and can you tell me when did that interview take place? Sure. Maybe that's the ambiguity I'm having a little trouble with. Sure. The three interviews with the investigating officers took place surrounding the interview with Lonnie Lesbrun. So isn't the question what the defense counsel knew at the time the decision was made, you know, pretrial, to not follow up with this witness? I think that that's right. And defense counsel knew all the way before trial, and never found out before trial that Lonnie was a witness to this crime. Well, okay. So the defense counsel knew the child had been present? Correct. And that perhaps she heard a door banging. So my question, I'm trying to ferret out, is what is the support for the blue brief's argument that the prosecution affirmatively misled defense counsel pretrial into understanding that the child didn't see anything? Well, defense counsel knew that the child was present, but the argument is that the State investigators affirmatively misled the defense by telling them that she wasn't a witness. So the fact that she was present was one thing, but the fact that she witnessed the crime was something entirely different. Exactly. And so when did they tell defense counsel that? Oh, I understand your question. I'm sorry, Your Honor. Defense counsel didn't learn of that until after trial. Did not learn of what until after trial? Defense counsel did not learn of the follow-up interview of Lonnie Lesbron until after the time of trial. It came forward That's still a different question. We understand that part. I'm trying to figure out what the prosecution did to pretrial to mislead defense counsel so that he may have decided not to follow up and interview this child that he knew was present. Prior to trial, the State informed defense counsel that she was not a witness. Defense counsel did not learn that she actually witnessed the crime or that there had been a follow-up interview with Lonnie where she described witnessing the crime until after trial. Can you just cite to the record for me? That's what I'm trying to get at. Oh, sure. Can you cite to the record for me when you said that the prosecution informed defense counsel she was not a witness? That's all I need. Where is that? ER 376 through 379. Okay. So I have read those pages, and your so you probably would have answered my question. Thank you. Sure. Unless there are any other questions about suppression, I think that the more interesting issues or the more difficult issues here are whether Lonnie's account is favorable and material. I think that looking at Lonnie's account, it's clearly favorable if you give it a careful reading. In Lonnie's initial account as documented in Detective Godoy's report, she identifies the assailant as a black man. Now, she also uses the name Angel to identify the assailant, and she uses these two identifiers interchangeably. So this test, this interview took place pretrial, and the child was really, I think your position, she was asking and answering her questions through her mother. That's correct. Is there anything in the record that tells us whether Mr. Medrano was known to this family, whether the child had ever seen him before, would have known who Angel was? There's actually evidence in the record that Lonnie did not know who Mr. Medrano was in order to personally identify him. Pre, I understand she saw his picture in the newspaper later, but at the time of the incident, she wouldn't have known who that person was, right? That's correct. She says in her later interview that she doesn't know who Mr. Medrano is in order to identify him. Yeah, but she didn't say that until in the second interview, whenever that was present. That's correct. But at the time of the initial interview, Mr. Medrano was charged with this crime and was in custody. And so it's unsurprising that her mother may attribute the name Angel to the assailant when she's leading her through the questioning. I think that we also know there's no recording of that interview, right? There's no recording, only the supplemental report that authored by Detective Goodoy. All right. I think we also know from Lonnie's later interview that that she only used the name Angel because that is the name given to the assailant by her mother. She says very clearly in her later interview, when asked if she knows the identity of the assailant, she says, My mom told me, but I forget. Yolanda, her mother, ends up confirming the same account. And again, as you pointed out, there is no way that Lonnie did not know Mr. Medrano before the time of the crime and couldn't identify him personally. She also said that she heard voices during the crime, but no specific words. So she didn't hear anyone use that name during the crime. What about the fact that in the second interview, she seems to contradict herself and say that she really didn't see anybody, that there are people blocking the view. So in the first interview, if I were to agree with you, then arguably she's identifying two different individuals, a black guy and Angel, she calls them, those two things. And of course, the opposing counsel has a different view of whether that's really one individual. But what about the fact that at the second post-trial interview, the child seemed to indicate that her view was blocked and she really didn't see anybody hit Pat in the back? Her later interview wasn't consistent on the issue of whether she actually witnessed anyone hit the victim. At one point, you're absolutely correct. She does say that there were people blocking the way, which is consistent with her original account as documented in Godoy's report, where she says that there are guys blocking the way. So she says at one point that there are guys blocking the way and she can't see what happens. But then later, she also says that she saw someone strike the victim. Perhaps all of that uncertainty really goes to the materiality prong. I think that the uncertainty created by her second statement and any inconsistencies in it, and I would note that her second statement is largely consistent with the account identified in Detective Godoy's report and that she identifies that there are other people present during the crime, and that alone would be enough to make this information material because it undermines the state's theory of the case that Mr. Medrano was acting alone and was alone with the victim and alone responsible for her murder. But I think that the inconsistency as to the identity of the assailant really goes to the credibility of Lonnie's original account. And under Williams v. Ryan, we know that we would need to have an in-court evidentiary hearing in order to make any credibility assessments about Lonnie's original account. I also think that Lonnie's, her later statements in that later interview, there are several reasons to question whether she was really able to independently identify anyone who committed the crime. She says that at this point, she's been present for several conversations where her mother has discussed the circumstances of the crime and also the assailant. She also says that the victim's husband has brought a gun to her house and shown it to her. And I think that undermines any implication that Lonnie was ever able to independently identify an assailant in that second interview. I think another point with materiality, we look both at Lonnie's account, which I think, if you look at it carefully, I think Lonnie identifies in her original report that a black man struck the victim and that other people were present. And I think those things are clear from the original report. We compare that with the evidence that was presented at trial in order to determine whether Lonnie's account is material. The evidence that was presented at trial isn't really disputed that Mr. Medrano was at the scene of the crime, that he had sexual intercourse with the victim, and that he woke up and found blood on his hands. Now, in that evidence, there's nothing that conclusively demonstrated that Mr. Medrano was the assailant. And the State relied heavily on Mr. Medrano's own inculpatory statements in order to make that leap and bridge that gap. And I think that looking at Mr. Medrano's statements, if we give them a careful review, it's very clear that he has no independent memory of this crime. Rather, he's concluded that he must have been responsible for the crime based on his own limited memory and what the police have told him. Well, I have to say, I mean, I've read, it was a frustrating experience. I read that long, rambling so-called confession. There's very little, actually, that's clear in terms of that he's reconstructing. He says, I'm reconstructing, but I'm not sure that he's really merely reconstructing. It's possible that that's an evasion. So I can't say that it's clear that he's reconstructing. It's possible when he says, well, I saw the blood on my hands, I must have done it, that that's his way of saying, yes, I did it. So I can't say that he's reconstructing. Here's me, I've got the following problem about Landy's first interview and statement, the one where her mother is present, the one that we have in the notes of, that's the basis for the Brady claim. How long after the event did that interview take place? About a year? I believe it was about a year after the event. So we've got a six-year-old who sees these things, waked up in the night, obviously traumatic. We know the six-year-old has nightmares about it. Adults would have nightmares about it. And now, a year later, the six-year-old is talking about various people there. She's clearly being coached by her mother. The name is, I think, pretty clearly being supplied by the mother. I can infer that the mother has decided that your client, the defendant, did it, so the mother's supplying the name. But I have trouble seeing that it is an unreasonable, because we're dealing with AEDPA, determination by the Arizona court that this wasn't sufficiently material to count as a Brady violation. I don't want to say that the state shouldn't have handed it over. I think the state should have handed it over. I mean, it's possible that the prosecutors themselves didn't know about it, but that the state clearly did know about it, and Brady applies. But I have trouble seeing how this was sufficiently exculpatory that I have to treat it as material. Can you help me on that point? I believe so. I'd like to begin by just pointing out that the Arizona Supreme Court clearly applied the incorrect Brady materiality standard in conducting its materiality analysis, and as a result, its decision is contrary to clearly established law, although I don't think that point responds directly to your question. I believe that the Arizona Supreme Court misapprehended the record before it, and I believe that its decision that Landy identified Mr. Medrano as the assailant was an unreasonable determination of the facts. The Arizona Supreme... She says, or at least the notes say that she says that Angel, the black guy, but she uses the name Angel, hit Patty in the back. But reviewing the notes, the notes also clearly indicate that she was being led through the questioning by her mother. Of course. And the prosecutor knew that Mr. Medrano was charged with the crime and in custody. So it's not surprising that she would be led to say that the name of the assailant was Angel. Oh, yes, of course. What would be very surprising is that she would be led to say that the assailant was a black man. But it has to be unreasonable. So to Judge Fletcher's point, because I have the very same question and I want to give you a really fair opportunity to answer it, it applies here. So why was it an unreasonable determination given that that's what the notes say? I appreciate that. So the Arizona Supreme Court concluded that Landy's testimony would have indicated at most that others were at the scene of the crime, not that the defendant did not commit it. In other words, the Arizona Supreme Court's review of the record, they read it as saying that Mr. Medrano committed the crime. Under Taylor v. Maddox and Mielke v. Ryan, we know that where a state court has before it yet ignores evidence that supports the petitioner's claim, that undermines confidence in the state court's fact-finding process. Here, the Arizona Supreme Court had before it evidence that an eyewitness identified a black man as the assailant. Yet the Arizona Supreme Court ignored that fact. So is it the failure to acknowledge that the notes can be read two ways that you think is unreasonable? I believe it's their failure to reconcile all of the evidence that was before them. I believe that that's required in Mielke and in Taylor v. Maddox in order to have confidence in the state court's factual determinations. I see that I'm almost out of time. So why don't we hear from the State and then you'll have a chance to respond. Thank you. May it please the Court. I'm Laura Chasen with the Arizona Attorney General's Office and I represent the Respondent, Charles Ryan, in this matter. Counsel, could I ask one question right off the bat on the Brady claim, not to focus on this, but I don't understand why there are so many mentions of the notes being given to the intern in the prosecutor's office and they didn't know the notes were in the file. A prosecutor was present with the investigator when the pretrial interview was conducted, right? Right. At the interview that resulted in the generation of this police report, yes, one of the prosecutors was there. And admittedly, certainly under state disclosure rules, the report should have been disclosed and nothing in the record explains why it wasn't other than the prosecutors weren't aware that the report had been written. I appreciate your candor. They were unaware that the report had been written? Correct. That doesn't sound very plausible to me. I mean, when you have an interview, nobody writes anything down? Well, all I can say is what I see in the record. You know, this happened a long time ago. I don't have an explanation for the oversight, so I apologize. You know, life would be so much easier if the prosecutor had just done what the prosecutor is supposed to do. You would have got your conviction anyway, I think. I'm not talking to you personally. I'm talking to your office. Just do your job. I understand. I don't think that the report was intentionally withheld. I do believe it was an innocent oversight. I don't think they saw it. I don't think the prosecutors saw it as this exculpatory information, and certainly it wasn't exculpatory that would have hurt their case. I believe that it was just overlooked. Well, you know, an awful lot of exculpatory stuff isn't flatly exculpatory, but if you've got a retarded man who confesses in this very rambling, weird way, and the one piece of confession that keeps coming up over and over again, the sort of shorthand I think about it every day, that's not recorded. That's hearsay. If I'm the defense attorney, what I want to do is I want to muddy the waters, and Landy is going to help me muddy the waters. I mean, your theory is he was there all by himself, he had sex with her, he murdered her, and he leaves. And now we have a six-year-old who may be unclear on lots of details, but she's got four people there. I mean, if I'm the defense attorney, I say, you know what, the state has something that it can't explain consistent with its theory of the case. I would like to address that. I'd like to point out that even though Mr. Medrano claimed not to remember the murder itself, his account of his arrival at the house, the time of his arrival, the fact that he honked his horn and Patty let him in is corroborated by the neighbor who saw this happen. So we have a consistent account of his arrival at the house, and we have a consistent account of his departure from the house 20 minutes later, after he had killed Patty. So Mr. Medrano states the consistent account of his having left the house 20 minutes later, the consistent account of having killed Patty is what's in dispute. But we know she was killed during that time. So and we know that Mr. Medrano arrived at the house alone, and he left the house alone. Both Mr. Medrano said that, and the neighbor who saw him come and go said that. Lundy says there were, that Mr. Medrano arrived with other people, and that there were other people in the house, that there was a dragon in the house, she said. She said Mr. Medrano was laughing at the kids jumping on the bed. When Mr. Medrano arrived, he didn't even know. But the dragon, and it shows up in the pages that we recited to, she's talking about a lamp that looked like a dragon. A lamp that looked like dragon's eyes. Correct. That's what came out later. At the time of this, she said it was a real dragon. So her own statements are inconsistent. She's a very young child, but that's part of the problem with this, of course. Exactly. Because a lot of time passed, because there was a failure to disclose, much closer to the time of trial. Well, there was never a failure to disclose, and I take issue with Ms. Hecker's claim that the State affirmatively misled her, misled the defense on the fact that the children were in the house, or the children might have seen it. At page 380 of the excerpts of record, in Mr. — in the interview of Detective Lowe, he states that he received a call from Laundie's mother, stating that — excuse me — stating that Laundie was having nightmares, and her mother wondered if it was something that she had seen from the night of the murder. Mr. Lowe, Detective Lowe, told the mother, yes, it certainly could have been something that she saw, and that may be why she's having nightmares. This happened a week before Laundie and her mother came into the police station and talked to Detective Godot. The interview was a week before that. So before Laundie talked to Detective Godot, Detective Lowe is telling the defense that she might have seen something. So it is wrong to say that the State affirmatively misled the defense on that issue. And I would ask that the — Kagan. What I was referring to, counsel, is the failure to disclose. A prosecutor was present at the interview. So I didn't mean to get — The interview itself, correct. I didn't mean to get you off on a different track, but I was following up on the point that you clarified earlier. A prosecutor was present, and there really isn't any explanation for why this wasn't disclosed.  The pretrial record.  Right. We accept that it wasn't disclosed. Under State rules, it should have been disclosed, but Brady did not require disclosure because it wasn't exculpatory. And this Court owes deference to the State court's finding that it wasn't exculpatory. What about opposing counsel's argument that just the fact that the child suggested that there was more than one person present, that that alone was exculpatory given the, you know, the other circumstances in the case? Well, I think at most it shows there might be another witness to the murder, which is not exculpatory because the child always identified Mr. Medrano as the killer. And I'd like to say — Yes and no. The child identifies Mr. Medrano as the killer while being coached by the mother and saying that he was a black man. Well, he was not a black man, and the mother supplies the name. In her later — The child identifying him as the killer is very suspect, and it's not very hard for a defense counsel to say, well, saying that Angel did it in that interview is clearly Mom saying it. In her — I have trouble seeing that the State had no obligation to turn it over. It may well be that in this posture of the case, the State's failure to turn it over has to be excused. But if I'm a prosecutor looking at that interview and I'm just trying to decide whether it is potentially exculpatory within the meaning of Brady, I don't think I have any question in my mind that I have to turn it over, not really in compliance with State rules, but in compliance with Brady. Well, in Lundy's later interview, she explains that — Well, that's the later interview. I'm looking at what the prosecutor had in that interview that the prosecutor was present at. Was that required to be turned over? In the later interview, Lundy backs away in various ways. But that interview, I think, is Brady material. And I respectfully disagree. The — So if you're — let me ask you it this way. You're the prosecutor. You're sitting in on that interview. You hear Lundy say there were four people. She describes the killer as a black man. You see that Mom is supplying the name, Angel, and you say you have no obligation to hand that over to the defense? I think it is not exculpatory because it identifies Mr. Medrano. And at the time she said that, she had already seen Mr. Medrano's picture and said he is the one who killed Patty. So she had already seen the picture of Mr. Medrano, and her mother apparently supplied the name. But that doesn't take away from the fact that she had identified Mr. Medrano and — I guess I don't want to argue with you because I'm not going to get anywhere with your conceding that this is not Brady material. So I'll make a different point. And it may or may not be determinant of this case in itself. I do not regard it as fair play for a prosecutor sitting there hearing that evidence, knowing that the other side doesn't know it, for the prosecutor not to reveal it. And I'm not here to defend what happened at the time that resulted in the failure to disclose. But I would like to discuss — Are you saying — I mean, let me ask you now directly. I understand you were not the person. But I'm asking you, what would you personally have done? Had you sat in on that interview with Landy, would you have turned over the results of that interview? I would have. There's only one right answer to that question. I would have, yes. Okay, thank you. No question. And as I say, certainly under State disclosure rules they were required to, and there's no explanation for why it wasn't done. But if we could go to the materiality and the edpedeference that's owed the State court's decision, I'd like to discuss that. The State court, even if you accept that the State court misstated the materiality standard when it rejected the claim — Well, it did, right? Well — I think it pretty clearly did. I think it inarticulately stated it. It seemed to me — well, okay. My reading is that it got it wrong, but that it immediately relied on, and I think really relied on, overwhelming evidence of guilt, the confession. Is that a fair assessment? Yeah, correct. So that means they're relying on the confession. I think it's the confession, the physical evidence showing he was there, the testimony of the people surrounding, the neighbor who saw Mr. Medrano come and leave alone, the fact that there was — and the confessions were very relevant, yes, because Mr. Medrano did not dispute that he killed this woman. And I think this Court's correct that we need to look at the result of what the State court decided rather than whether it applied the proper standard because the issue is, did it reach an objectively reasonable decision? And it did. It's really tough to do this in 20-20 hindsight because, of course, you've read the opposing party's brief. The problem is he didn't dispute that he was present, and he was under the influence of something or other, and he certainly was cognitively impaired. He was subsequently deemed mentally retarded. And given that, the defense theory was not to contest, actually, because he was the only one there, that he must have committed the murder, but he didn't recall it. That might have been played out very, very differently if they had understood there was an indication that more than one person was present. I think if we're looking at the materiality of these statements, we need to look at what if a 7-year-old had gotten on the stand and, by the way, at the time, children under 10 were presumed incompetent. So before she could have taken the stand, the Court would have had to determine that she was competent to testify. But assuming she did that and she got up and she testified to what she testified in her statements about other people being there, the State would get up and point out the inconsistencies in the testimony, the fact that she remembered these things more than a year after the events occurred, and the fact that she had heard adults in her house discussing the murder during that year. That's why it's so tough to unwind. That's exactly why it's so tough to unwind and so unfair that the disclosure wasn't made. This is why it's not material and would not – there's no reasonable probability that the verdict would be different, because Mr. Medrano's statements of what he does remember of that night are consistent with the neighbors that he came and left alone, contrary to what Landy stated, and that he was alone in the house. There's no evidence. When Mr. Medrano arrived at the house, all the lights were out. Patty turned on the lights before he came in and let him in. And so there's no evidence that anyone was there at the time he arrived. If someone came after he was already there, that would mean that they would have had to come after Mr. Medrano had sex with Patty and before he woke up with blood in his hands, and all of that would happen in 20 minutes because the neighbors saw him leave 20 minutes later. There's also evidence. One of the things that really bothers me about this case, and I have to say it leaves a really bad taste in my mouth, is this case was being litigated. It was a death case. Yes. It is no longer a death case. Correct. I'm a prosecutor in a death case. I sit in on an interview where a child says there were four people in the house, and I'm not handing it over. When death is at stake, I just don't get it. And as I say, I'm not here to defend that. What we're dealing now with the results of that. I know you're not here to defend it, but I'm left in a situation where I am extremely uncomfortable with the behavior of the prosecutor, and it's very difficult for us to go back and sort of unwind all of this stuff. And the problem really lies in your office. It was with the county attorney at the time, yeah, in the county attorney's office. I shouldn't say your office, not the AG's office. And I agree that it created a very difficult situation, and the evidence should have been disclosed. And in the death case, this is not some panty-ante burglary where somebody's going to go to jail for two years. The state's trying to kill this man. Well, I submit that a defendant's entitled to the protections of Brady, no matter what the crime at issue is, more so because it's a death case. Of course that's right, but I have to say the stakes are enormously increased when the state is trying to kill someone and when the prosecutor sits in on an interview where a child says four people were in the house, and the prosecutor somehow doesn't think that there's any obligation to tell the defense counsel that that interview has taken place. I see my time is up. Are you confident that prosecutors in Arizona appreciate what Judge Fletcher's been saying to you for the last 20 minutes? Am I confident that prosecutors appreciate it? I think prosecutors in Arizona are certainly ‑‑ I don't think they needed Judge Fletcher to explain the duty to them. They do understand the import of what they do. They do understand it. Why didn't they do it here? I mean, I've got cognitive dissonance here. You're telling me they understand, yet I have a case in which they didn't do it. I'm sorry. The prosecutors I know now in Arizona understand these duties and follow them to the best of their ability. Do you participate in training young prosecutors, veteran prosecutors? I don't personally train them, no. Will you go back and suggest that that would be a good idea? We will certainly always emphasize their duties under Brady and all of our disclosure rules. As I say, the state disclosure rules are much broader than Brady, so this information should have been disclosed anyway, but certainly Brady material is certainly always required to be disclosed. Thank you. This is a case where the state relied on the inculpatory statements of a mentally retarded man in order to secure his conviction and ultimately, as you noted, a sentence of death, all while suppressing key evidence that an eyewitness saw that there were other people present during the crime and that a man of a different race assaulted the victim. Counsel, I know your time is very limited, but I read this two ways. Your brief, I think, says that. It says that the prosecution suppressed evidence that there were four people present. The initial, the pretrial statement, Landy made this confoundingly ambiguous statement about a black guy and angel, and she conflates that. And so the question is, well, did she conflate it? The question is that one person or two people in the pretrial interview, isn't it just the post-trial interview where she says there are four people present? I see that as raising two questions. One, whether she identified two people in the pretrial interview. I didn't ask a good question, so here's the question. In the pretrial interview, I don't think she said there were four people present. I think that fact only comes out in the post-trial interview. Is that right? I'm not sure that that's exactly accurate. In her pretrial interview, she says the angel, the black man, so that's one person. She's identifying one person, not using two people interchangeably. It's she's identifying one person, a black man, and she's using the name angel. She says that he's present. She also says that a woman is present and that there are guys blocking the way. Now, nobody asked her about. Now, you're talking about the second interview. I'm talking about the pretrial interview. In the pretrial interview, she says that there are guys who are blocking the way. Guys blocking the way, but where's the woman? The woman and the man entered the house together. Okay. Wait a minute. Look, okay. Baby laughing, boy knocking at the window, two people, one boy, one girl. Oh, these are the adults as opposed to the little children. Yes. That's how you read that. That's how I read that. That two people came into the house. But there was one boy and one girl, younger children, present with her as well. Yes, and she mentions the younger children, that the baby, Alex, was laughing. Then she says there was a boy knocking at the window. These are the adults now that she's identifying. Right. There's a boy knocking at the window next to the door and that there are two people, one boy and one girl. I read that as her identifying both a male and a female who enter the house together. She goes on to refer to the male as the black man. In the post-trial interview, she's quite clear, four people came in. That's right. The woman and the black man again arrive at the house together and then two additional men enter the house. So when your brief says that the pre-trial interview talked about four people, you're calling one boy, one girl. She says two people, one boy, one girl. Yes. And you're counting these as adults. Yes, I'm counting those as adults. Thank you. And then later, guys next to couch, guys blocking the way. Right. Right. And she said that both times. She said that both times, that there were guys blocking the way. Yes. Okay. She doesn't identify the number of the guys in her original statement for that. It appears that her later statement would clarify that information. Pardon my interruption. No, I appreciate the question. I think that to the concern or to the extent that Your Honors are concerned about applying EDPA to this case, I think that there's a very clear way to apply EDPA to this case. It's very clear from reading the Arizona Supreme Court's decision that they identified and applied the incorrect materiality standard. And when reviewing the state court's decision, we focus under 2254 D1, we focus on their actual analysis. And they state the standard that they're applying and go on to apply it. What about their finding of overwhelming evidence of guilt? They do state that there's overwhelming evidence. They go on immediately to cite to Mr. Medrano's alleged confession. They excerpt language from Mr. Medrano's inculpatory statements, indicating that it's a complete acceptance of guilt, but they fail to account for the fact that carefully reviewing his statements demonstrates that he has no independent memory of this crime and he's not confessing to any conduct that he actually remembers. So there's no way that looking just at Mr. Medrano's statements that that could be overwhelming evidence of guilt. First, he has no independent memory of the crime, as just discussed. And second, we know now that Mr. Medrano is intellectually disabled. And the Arizona Supreme Court had before it evidence of Mr. Medrano's intellectual disability. At the time, they were adjudicating this Brady claim, and that's in the record at ER 310 through 321. But could not judges disagree about whether it was overwhelming evidence of guilt? And if the answer to that is yes, that judges could disagree about that, then our hands are tied, are they not? Well, I believe that there's no evidence that conclusively demonstrates that Mr. Medrano committed the crime. And to the extent that we can look at the Arizona Supreme Court's decision, we have to focus on what they actually did. The Arizona Supreme Court concluded that there was overwhelming evidence, but only by relying on Mr. Medrano's confessions or what it termed as his confessions. And as we know, if we look carefully at the facts that were before the Arizona Supreme Court, Mr. Medrano never actually confessed to the crime and has no independent memory of the crime. I'd encourage Your Honors to actually listen to the audio transcript that we've supplied and also review our own transcript. I know this is a lot of information on a single point, Mr. Medrano's recorded statement, but I think that listening to his recorded statement is very illuminating. It's very clear going through his statement that he's attempting to figure out what happened. He's asking the police questions. He's trying to get information from them. And he's attempting to help them solve this crime, the crime where he's the suspect. And ultimately, he concludes that he must have done it. Okay. Thank you, Your Honors. Thank you very much. Thank both sides. Medrano v. Ryan now submitted for decision.
judges: Davis, Fletcher, Christen